UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
TUCSON DIVISION

CIVIL ACTION NO. _____

JEFFREY MALKAN, and
SUSAN MALKAN,

        *Plaintiffs*,

v.

OMNI HOTELS MANAGEMENT CORP.,

        *Defendant*.

COMPLAINT     CV-20-60-TUC-JGZ

DEMAND FOR JURY TRIAL

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Jeffrey Malkan and Susan Malkan, bring this civil action against the Defendant— Omni Hotels Management Corp.—and allege as follows:

**NATURE OF THE ACTION**

1. This is an action for compensatory and punitive damages based on injuries caused by the agents and management of the Omni Tucson National Resort (the "Omni") for (a) defamation, (b) negligent hiring, training, and supervision, and (c) intentional infliction of emotional distress.

2. The dispositive fact alleged here is that an employee of the Omni, against whom the Plaintiffs had earlier that day submitted a customer service complaint, falsely reported a public safety emergency via a 911 call to the Tucson Police Department. Her attempt to protect her job by discrediting the complainants resulted in their eviction from their

hotel room, which they were peacefully occupying, late in the evening, and in a strange city.

3.　　The failure of the Omni to implement rules, standards, and procedures to protect the safety and security of its guests was negligent and reckless, and the acts of its agents and employees, in allowing these guests to be unlawfully evicted from the premises by means of a defamatory and false police report, were knowing, willful, malicious, and criminal.

## PARTIES

4.　　Plaintiffs Jeffrey Malkan and Susan Malkan were guests at the Omni Tucson National Resort on January 7, 8, and 9, 2020.

5.　　Defendant Omni Hotels Management Corporation is the owner and operator of an international hotel chain, including the Omni Tucson National Resort at 2727 W. Club Drive, Tucson, AZ 85742.

## JURISDICTION AND VENUE

6.　　This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1).  The Plaintiffs and the Defendant are citizens of different States.  The Plaintiffs are citizens of New York.  The Omni Hotels Management Corporation is incorporated in Texas, 4001 Maple Ave., Ste. 500, Dallas, TX 75219, where it also has its principal place of business.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.　　Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b). The Omni Tucson National Resort is located and has its address in Tucson, Arizona, where all the facts alleged in this complaint occurred and all evidence and witnesses are located.

## FACTUAL ALLEGATIONS

8.　　The Omni Tucson National Resort is a luxury resort hotel.  The Omni's customer service protocol (available online at https://www.omnihotels.com/power-of-one)

articulates the standard of care applicable to this segment of the hospitality industry:

> At Omni Hotels & Resorts, we know that any one event can affect an entire stay. One extra gesture, one kind interaction, one example of going that extra mile to help someone with something he or she needs — all these and more are small events that can add up to a profound change in perception and experience.
>
> For this reason, we encourage and expect each of our associates to do his or her personal best to ensure our guests feel comfortable and appreciated. This is how we deliver one remarkable stay after another.
>
> We've defined several easy ways for our associates to create memorable stays for every single one of our guests.
>
> Think! Use our common sense.
>
> Know and satisfy our customers' expectations.
>
> Greet customers immediately with our undivided attention.
>
> Smile and make eye contact.
>
> Make the first and last 30 seconds count. Ask our external customers about their stay and invite them back.
>
> Be natural and appropriately friendly.
>
> Use our customers' names whenever possible.
>
> Promptly answer telephones with a "smile" in our voice.
>
> Determine the needs and wishes of our customers and make decisions that benefit them. Bend the rules sometimes.
>
> Take ownership of our customers' needs and wishes and personally follow through on their complaints.
>
> Escort customers whenever possible.
>
> Stay up! Be energetic! Take good care of ourselves!
>
> Wear our uniforms and name tags in an immaculate manner.
>
> Take personal responsibility for cleanliness and safety.
>
> Be ambassadors for our hotel and promote it enthusiastically.

Be a team player.

Protect and maintain all hotel assets and equipment — we all earn a living here.

Always remember that we are hospitality professionals.

Always maintain your smile even though your customer may not.

### The initial customer service issue at the front desk

9.     On Tuesday night, January 7, 2020, Mr. Malkan, a retired attorney and law professor, and his co-plaintiff Susan Malkan, a retired pharmaceutical sales executive, checked into a room at the Omni Tucson National Resort, where they were staying for the purpose of purchasing on a new home in that city.

10.    That evening, they were relaxing in the outdoor whirlpool when an unknown person, wearing a blue polo shirt and an ID card on a lanyard around his neck, descended from the balcony on the second floor of the building across from the pool area to tell them to lower their voices because he and his party guests could "hear every word you're saying."

11.    Ms. Malkan was embarrassed and intimidated by this approach from a person who was apparently connected with the Omni in some official capacity, and she went up to the lobby desk to complain about being chastised and harassed for no discernible reason.

12.    The night manager behind the desk, whose ID badge identified her as Kara Boulten, said (a) that the "event planner" who had chastised her at the pool was not a hotel employee, (b) that she had no control over the actions of an independent contractor on the Omni premises, and (c) that she would tolerate no further discussion of the matter. Her response was so unexpected and so hostile that Ms. Malkan began to cry.

13.    Ms. Boulten handed Ms. Malkan a box of tissues, but continued her tirade in defense of the event planner, and then said that she refused to continue "going around in

circles" with a hotel guest, making hostile circular and pointing gestures with her hands.

14. Another person then appeared from a room behind the front desk, and aligned himself next to Ms. Boulten. He identified himself as Peter [Prassas], the manager of "Bob's Steak and Chophouse," the hotel restaurant, and warned Ms. Malkan that he would not allow Ms. Bouten to be "abused" by a hotel guest, sarcastically adding that "I'm a big guy. If you need someone to protect you, I'll come down to the pool and stand guard."

### The meeting with Mark Estrada, Human Resources Manager

15. In the late morning of January 9, the Plaintiffs asked to see Jeff White, the General Manager, to discuss the hostility and belligerence they had experienced at the front desk, but he was supposedly unavailable, so they settled for a meeting with Mark Estrada, the Human Resources Manager, and Rachel Utir, his assistant.

16. They reviewed the matter in the hotel conference room for almost an hour, and Mr. Estrada, who was taking copious notes, said that he would find out what had happened and resolve their complaint that day.

17. He made no apology for this disruption of their stay, nor did he offer them the option of cancelling their prepaid reservation so that they could depart for another hotel.

18. He agreed with Mr. Malkan, however, that an outside contractor on the Omni property should not be allowed to harass its hotel guests.

19. Ms. Malkan interjected that she was now afraid to walk through the lobby and would like to have something like a "restraining order" against Ms. Boulten. Mr. Estrada replied that it was impossible for him to provide that because of Ms. Boulten's job duties, but that she could be assured she would have no further interaction with Ms. Boulten for the remainder of their stay.

20. She accepted that assurance and that ended the meeting. By evening, however, they had heard nothing from Mr. Estrada, and, having wasted the better part of the day waiting for a response, called the front desk asking to be sent some room service food. Again, nothing happened, so they started walking through the lobby, which was devoid of arriving or departing guests at that time of the evening, on the way to their car.

### The Omni evicts its guests by means of a false police report

21. They stopped at the front desk to inquire about why they had yet not heard from Mr. Estrada and received exactly the same treatment from another Omni employee, Grace Neely, who ran out from behind her work station to confront them in the lobby, gesturing and pointing in a way that frightened Ms. Malkan, who asked her to stop. Ms. Neely replied that she always talks with her hands. Ms. Malkan then asked her again to try not to do that, because it was scaring her.

22. At that point, the room service food finally arrived at the front desk, and the Plaintiffs accepted the bag and headed back across the lobby to their room.

23. As they were descending the main stairway, Ms. Boulten, whom they had not previously seen that evening, jumped out from the head of the stairs and shouted down at their backs that she had called the police to have them forcibly evicted. "You're still here?" asked Mr. Malkan, referring to Mr. Estrada's promise that they would see no more of her. "You bet I am," Ms. Boulten called back down at him.

24. Within five minutes a police tactical response team – three patrol cars, one of them a large SUV – had arrived and the officers were pounding on their hotel room door.

25. Mr. Malkan put down the sandwich he was eating and opened the door to two law enforcement officers who informed him that they were being removed from the premises.

26. In other words, the Omni was throwing its guests out onto the street, under threat of arrest, in a strange city, at approximately ten o'clock at night, when they were peacefully occupying a room for which they had paid in full, and without any previous request from anyone in the Omni's management to vacate the room.

27. When they had finished packing, which they did under duress and armed guard, they were marched through the lobby, past the front desk, which was now shut down.

28. One of the police officers would not allow Mr. Malkan to drive his own car, claiming that he had seen two half-empty glasses on the dresser and night table across the room, and also that he had seen Mr. Malkan run across the room and gulp down both glasses at the moment the door was opened.

29. He could not have made this ludicrous assertion unless he had entered the room without invitation and without a search warrant.

30. It was obvious that he was simply repeating the false and defamatory statements that he had received from Ms. Boulten in order to justify the forcible eviction.

31. It was also obvious that any attempt to resist the authority of these officers would result in a forcible police response.

32. Finally, it was obvious that the reason they were being rousted from the safety of their hotel room at this late hour of the evening was simply this – a desk clerk about whom the Plaintiffs had filed a customer service complaint that morning had been placed by the Omni in a position of power and authority, at the end of the day, from which she thought she could discredit the complaint by counter-filing a false police report.

33. Before Ms. Malkan pulled away from the front entrance, one of the police officers gave her a card with the case number and repeated that they were to leave the Omni

immediately.

34. The patrol cars followed Ms. Malkan down the hotel driveway with flashing lights until they had exited the Omni property.

35. On January 11, 2020 the Omni charged $744.38 to Mr. Malkan's credit card for the full stay of four nights, which consisted of the night they had been harassed by the "event planner," the night the police invaded their room, and the next two nights after they had been evicted from the hotel.

## CAUSES OF ACTION

### Count 1

### (Defamation)

36. Plaintiffs repeat and reallege the allegations of paragraphs 1-35 as if set forth fully herein.

37. On January 9, 2020, Ms. Boulten took unlawful action in her capacity as an agent of the Omni to have the Plaintiffs forcibly evicted before the evening was over because she did not want them to be available the next day when the General Manager returned to his duties in the hotel.

38. She communicated her defamations to the Tucson Police Department for the purpose of fabricating a public safety emergency that would bring a tactical police response.

39. These defamations were calculated to provoke the disruption that she was planning to create in the hotel lobby.

40. The Plaintiffs are persons of known sobriety, rectitude, and maturity.

41. There is no possibility that any evidence can or will be produced to show that either of them was drunk and disorderly at any time relevant to these allegations, or, indeed, at

anytime, anywhere, ever.

42. There is also no possibility that any evidence can or will be produced to show that the Plaintiffs (a) made any verbal threats against Ms. Boulten or anyone else, (b) made any threatening gestures against Ms. Boulten or anyone else, (c) used threatening, profane, or abusive language against Ms. Boulten or anyone else.

43. Finally, there is no possibility that any evidence can or will be produced to show that the Omni's management ever suggested to the Plaintiffs (a) that they should leave the hotel voluntarily, (b) that any inducements were offered to compensate them for the inconvenience and expense of voluntarily changing hotels, or (c) that they were ordered to leave the hotel involuntarily and refused to depart peacefully.

## COUNT II

### (Negligent Hiring, Training, and Supervision)

44. Plaintiffs repeat and reallege the allegations of paragraphs 1-43 as if set forth fully herein.

45. The Omni has a duty to safeguard its guests from foreseeable hazards on its premises, which includes ensuring that its guests are safe from crimes by its own employees.

46. The tactical police response to the 911 call resulted from the false report filed by Ms. Boulten, who, on the evening of January 9, had been entrusted by the Omni with executive control of the hotel's front desk.

47. Arizona law stipulates that false reporting to a law enforcement agency is a criminal offense:

> It is unlawful for a person to knowingly make to a law enforcement agency of either this state or a political subdivision of this state a false, fraudulent or

unfounded report or statement or to knowingly misrepresent a fact for the purpose of interfering with the orderly operation of a law enforcement agency or misleading a peace officer.

*See* A.R.S. sec. 1329-07.01.

48. The statute further defines the offense by specifying the mens rea requirement of the crime of false reporting:

A. A person commits false reporting by initiating or circulating a report of a bombing, fire, offense or other emergency knowing that such report is false and intending:

1. That it will cause action of any sort by an official or volunteer agency organized to deal with emergencies; or

2. That it will place a person in fear of imminent serious physical injury; or

3. That it will prevent or interrupt the occupation of any building, room, place of assembly, public place or means of transportation.

*See* A.R.S. sec. 1327-07.

49. False reporting is a class 1 misdemeanor, except that a second or subsequent violation is a class 6 felony. *See* A.R.S. sec. 1329-07.01 (C).

50. Ms. Boulten dialed-in an emergency call from the Omni Hotel to the Tucson Police Department 911 service at or around 9:45 PM on January 9, 2020.

51. There was no bombing, fire, offense or other emergency to report from the Omni that evening.

52. She committed this violation of Arizona law for the purpose of provoking a tactical police response that she knew would disrupt the orderly operation of a law enforcement

agency as well as place the Plaintiffs in fear of imminent serious physical injury.

53. She further knew that the resulting police response would interrupt and prevent the occupation of a place of public accommodation – i.e., the Omni hotel room – which the Plaintiffs were lawfully and peacefully occupying. In fact, that was her purpose for doing so.

54. The Omni knew, or should have known, prior to January 7, 2020 that Ms. Boulten was a probationary employee who had not been properly trained for customer service or hotel management responsibilities, and was perhaps temperamentally unsuited for employment in the hospitality industry.

55. By the evening of January 9, the Omni indisputably knew that the Plaintiffs needed to be protected from Ms. Boulten on the hotel premises, as, in fact, Mr. Estrada had promised that afternoon he would do.

56. Her retaliation against the Plaintiffs was practically inevitable after Mr. Estrada told her about their customer service complaint, but did nothing to protect them from her retaliation. To the contrary, he left Ms. Boulten in charge of the front desk that very evening, which reflected the Omni's gross negligence with regard to the safety and well-being of its guests.

57. The Omni's failure to maintain the standard of care that any competent and reasonable innkeeper would maintain in the hospitality industry was the proximate cause of the injuries suffered by the Plaintiffs.

## COUNT III

### (Intentional Infliction of Emotional Distress)

58. Plaintiffs repeat and reallege the allegations of paragraphs 1-57 as if set forth fully herein.

59. The courts of Arizona recognize that extreme and outrageous conduct may cause severe emotional distress for which a corporation, through the actions of its agents, may be subject to liability.

60. In addition, the tort of emotional distress inflicted intentionally or recklessly is recognized in Arizona as a separate and distinct basis of tort liability. There is no need to show elements of other torts such as assault and battery.

61. The elements of emotional distress have been prescribed by the Supreme Court of Arizona. First, the conduct by the defendant must be "extreme" and "outrageous." Second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his or her conduct. Third, severe emotional distress must indeed occur as a result of defendant's conduct.

62. First, it was extreme and outrageous for Ms. Boulten, acting as an agent of the Omni, and under its authority, to concoct a scheme to protect her job by dialing in a false 911 call to the Tucson Police Department, which she knew would result in the intimidation, harassment, and forcible eviction of the Plaintiffs, who were peacefully occupying their hotel room in the late evening hours of January 9, 2020.

63. Second, the Omni knowingly and willfully left Ms. Boulten, who was a known hazard to the Plaintiffs, in charge of the hotel's front desk that evening. The management of the front desk put her in a position of power and authority to abuse, defame, and terrorize the Plaintiffs, and the Omni recklessly disregarded the near certainty that she would do so.

64. Finally, it was inevitable that severe emotional distress would be inflicted, under these circumstances, on any reasonable person of the Plaintiffs' age, health, and social standing.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

(a) Award compensatory damages to the Plaintiffs for defamation and negligent hiring, training, and supervision in the amount of $2,500,000, and punitive damages for the intentional infliction of emotional distress related to, and resulting from, these tortious acts in the amount of $2,500,000; and

(b) Award pre- and post-judgment interest, attorney's fees, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury on all issues so triable.

Respectfully submitted,

/s/ Jeffrey Malkan

/s/ Susan Malkan

Plaintiffs *pro se*
12 Valleywood Ct. W
Saint James, N.Y. 11780
(631) 862-6668
jeffrey.malkan@outlook.com

Dated: February 3, 2020